CUMMINGTON SCHOOL OF THE ARTS, INC. *vs.* BOARD OF ASSESSORS OF CUMMINGTON.

Suffolk.    September 12, 1977. — November 4, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Taxation,* Real estate tax: exemption. *Charity. Corporation,* Charitable corporation. *Words,* "Educational."

In a proceeding to determine whether a charitable corporation conducting a summer program for arts educators and advanced arts students was exempt from taxation under G. L. c. 59, § 5, Third, the evidence

was insufficient to support the Appellate Tax Board's finding that the corporation's activities benefited only a limited class of persons. [599-602]

Discussion of factors to be considered in determining whether a corporation is operated primarily for educational purposes within the purview of G. L. c. 59, § 5, Third. [602-605]

APPEAL from a decision of the Appellate Tax Board.

*Sandra Shapiro* for the plaintiff.

*Harley M. Sacks* for the defendant.

WILKINS, J. Cummington School of the Arts, Inc. (CSA), appeals from a decision of the Appellate Tax Board (board) denying CSA an abatement from local property taxes assessed from 1972 through June 30, 1975. CSA, which owns 150 acres of land and various buildings in Cummington, claims that its real and personal property is exempt from taxation under G. L. c. 59, § 5, Third, as property of a "literary, benevolent, charitable or scientific institution." The board concluded that CSA was not entitled to the statutory exemption and denied CSA's petitions for abatement.[1] We conclude that the board's decision is not supported by the evidence and remand the consolidated proceedings to the board for further consideration.

Each summer CSA, which is organized under G. L. c. 180, conducts an arts program for arts educators and advanced arts students. The assessors and the board agree that CSA was incorporated for educational purposes and has "all the external indicia of a charity." None of its activities is carried on for private profit, and CSA is exempt from Federal income taxation. For forty-one years prior to 1972, the assessors treated CSA's real estate and personal property as exempt from local taxation under G. L. c. 59, § 5, Third. The present dispute, which arose when the assessors refused in 1972 to continue to exempt CSA's prop-

---

[1] CSA's applications for abatement were consolidated for hearing before a member of the board. Pursuant to CSA's request (G. L. c. 58A, § 13), the board filed "findings of fact and report." CSA's appeals have been consolidated for presentation here.

erty, centers on the question whether, in its actual operations, CSA is being conducted as a public charity for educational purposes.

To qualify for the exemption, CSA had the burden of establishing not only that the purposes for which it was incorporated are charitable, but also that in actual operation it is a public charity. *Massachusetts Medical Soc'y* v. *Assessors of Boston,* 340 Mass. 327, 332 (1960). *Fisher School* v. *Assessors of Boston,* 325 Mass. 529, 533 (1950). *Jacob's Pillow Dance Festival, Inc.* v. *Assessors of Becket,* 320 Mass. 311, 313 (1946). In an attempt to meet this burden, CSA offered certain exhibits and the testimony of four witnesses who had been associated with its summer programs during one or more of the tax years in question.[2] It is not necessary to recite in detail the evidence concerning CSA's operations. It is sufficient to note that teachers in the arts and advanced students in the arts attend the summer programs. A few participants attend with their families. CSA charges participants for attendance, but those who cannot pay receive scholarship aid. Arts educators are considered as participants, along with arts students, and they are not compensated. CSA receives approximately two-thirds of its income from public contributions. CSA has no formal schedule of instruction, and any teaching relationships are informal. Participants engage in independent study, workshops, discussions, exhibitions of work, and free public performances, related to their arts projects. Participants are solicited in part through publications and mailings and are chosen by a committee of CSA's board of trustees. CSA introduced

---

[2] One witness, an artist and teacher, was a trustee of CSA and had been director of the program in 1973, 1974, and 1975. The second, a teacher and the director of a private school, had been a trustee of CSA since 1960 and participated in the 1974 summer program. The third witness, a member of the faculty of Sarah Lawrence College, was the then current president of CSA's board of trustees and had participated in summer sessions in 1972, 1973, and 1975. The final witness, a professor of literature at the Massachusetts Institute of Technology, had been a trustee since 1972 and had participated as a teacher of creative writing in the summer of 1966.

exhibits listing its participants by year. These exhibits showed a significant turnover among the people who participated in summer programs from one year to the next. The error which we perceive in the board's decision arises from its misinterpretation of this evidence concerning participation in CSA's programs.

We view the conclusions expressed by the board in its report as resting largely, if not exclusively, on its finding that CSA was operated primarily for the benefit of a limited class of persons and that the public at large benefited only incidentally from CSA's activities. The board relied heavily on three opinions of this court (*Massachusetts Medical Soc'y* v. *Assessors of Boston,* 340 Mass. 327 [1960]; *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712 [1944]; *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248 [1936]) in which tax exemptions were denied because the activities of the taxpayers were of primary benefit to a limited class of people. Even if we were to accept as warranted the board's finding that CSA's activities did not benefit the public at large or some part thereof (see *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph,* 334 Mass. 530, 540 [1956]; *Assessors of Boston* v. *Garland School of Home Making,* 296 Mass. 378, 388 [1937]), the board's conclusion that CSA's activities did not benefit an indefinite class of persons is not justified on the evidence.[3] Educational organizations may qualify under G. L. c. 59, § 5, Third, as charitable if they benefit an indefinite class from among the public, even if they do not directly benefit the public generally. *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph, supra* at 540. *Assessors of Boston* v. *Garland School of Home Making, supra* at 387.

---

[3] On a proper record, including the evidence before the board, an appellant may challenge the board's findings on the ground that they are not supported by the evidence. *New Bedford Gas & Edison Light Co.* v. *Assessors of Dartmouth,* 368 Mass. 745, 749 (1975). *Fisher School* v. *Assessors of Boston,* 325 Mass. 529, 533 (1950).

373 Mass. 597                                        601

Cummington School of the Arts, Inc. *v.* Bd. of Assessors of Cummington.

The board noted that the arts educators attending CSA in 1972 were listed also as participants in the 1972 summer session and that three of the participating arts educators were members of CSA's board of trustees as well. These facts do not show that the group of persons benefiting from CSA's operation was a closed one. Obviously, the number of participants in 1972 was finite, as must be the case. But, as the board seemingly found, no one may attend CSA for more than three summer sessions.[4] CSA's uncontroverted evidence showed an attempt to obtain participants by notices in national literary publications and by announcements at college campuses. More importantly, that evidence also indicated that there was a substantial, but not total, turnover of participants from year to year.[5] Many schools and colleges qualifying for exemption have a greater continuity of attendance by students from year to year than CSA. See *Assessors of Lancaster* v. *Perkins School*, 323 Mass. 418, 421 (1948). We conclude that the board's finding that the operation of CSA benefited only a limited group of persons cannot stand. In this respect CSA is in a position more akin to that in *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph*, 334 Mass. 530, 540 (1956), and in *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 388 (1937) (student bodies which changed composition from year to year), than that present in *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 255-256 (1936) (largely unchanging class of season ticket holders). The board must reconsider the evidence before it,

---

[4] The board's "findings of fact and report" presents certain facts under the heading "The Evidence." Some of those facts are clearly presented as findings, while it is unclear whether some other statements are merely recitations of the evidence presented. The board's statutory "findings of fact and report" (G. L. c. 58A, § 13) should separate actual findings from any discussion of the evidence so that appellate review may be had on a clear statement of the reasons for the board's action.

[5] In its reliance on attendance records in arriving at its erroneous conclusion that the class of benefited persons was limited, the board appears to have accepted as true CSA's record of annual attendance.

and consider any additional evidence it may choose to receive, to determine whether CSA has met its burden of establishing its right to an exemption.

We believe it may be instructive to the board, CSA, and the assessors to comment on the considerations which the board should have in mind in its further deliberations. We are prompted to do so in part because the circumstances of CSA's nontraditional operations must be examined carefully to ascertain whether CSA has established that its activities are predominantly educational, and thus charitable, or whether CSA has shown merely that it furnishes facilities for summer vacations for people interested in the arts. See *American Inst. for Economic Research* v. *Assessors of Great Barrington,* 324 Mass. 509, 513 (1949). We are further moved to comment as to matters on which the board should focus its attention because the "findings of fact and report" refers to particular circumstances which may have influenced the board's conclusion, although the board did not explicitly state its reliance on them. In certain respects, the board's "findings of fact and report" adopts the tone of a disbelieving, biased advocate rather than that of a dispassionate arbiter of the issues of fact and law argued before it.

We start with the established principle that an educational institution of a public charitable nature falls within the statutory phrase "literary, benevolent, charitable or scientific institution." G. L. c. 59, § 5, Third.[6] *Assessors of Boston* v. *Garland School of Home Making,* 296 Mass. 378, 386 (1937), and cases cited. Although the question of the credibility of witnesses is for the board, CSA's evidence appears to support the conclusion that it is not carried on

---

[6] The statute has been said to exempt "institutions which a court of equity would hold to be within the provisions of St. 43 Eliz. c. 4, and charitable institutions organized to administer trusts in aid of the general welfare which are the outgrowth of the conditions of modern society . . . ." (*Molly Varnum Chapter, D.A.R.* v. *Lowell,* 204 Mass. 487, 493 [1910]), subject, however, to the limitation that this general exemption may not override any special or more limited statutory exemption. *Assessors of Boston* v. *Garland School of Home Making,* 296 Mass. 378, 385 (1937).

373 Mass. 597                                                    603

Cummington School of the Arts, Inc. *v*. Bd. of Assessors of Cummington.

for private profit, and we do not understand the assessors to have argued or the board to have found the contrary. We have already noted that CSA is operated for an indefinite class of persons. The question thus is whether CSA is operated primarily for an educational purpose.

We have construed the word "educational" as including education in the "broad and comprehensive" sense of the term. *Mount Hermon Boys' School* v. *Gill,* 145 Mass. 139, 146 (1887). Our cases have recognized an institution's entitlement to exemption even where its educational goals were not within traditional areas of education. See, e.g., *Assessors of Lancaster* v. *Perkins School,* 323 Mass. 418 (1948) (special education for the retarded); *Assessors of Boston* v. *Garland School of Home Making, supra* (education in home making). Cf. *Boxer* v. *Boston Symphony Orchestra, Inc.,* 342 Mass. 537, 539 (1961) (tort case: summer music school); *Newton Centre Woman's Club, Inc.* v. *Newton,* 258 Mass. 326, 330-331 (1927) (support for numerous civic activities, including a music school and free art exhibitions). Thus, the fact that CSA does not make "significant contributions to the educational mainstream," as the board might be read to have found, is not decisive of the issue it must decide. That fact merely makes CSA's burden of persuasion and the board's fact-finding tasks more difficult. "[T]he more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government." *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 718 (1944).

CSA must establish that it makes a contribution to education and that that is its dominant activity. The board is entitled to consider that CSA confers no certificates for completion of courses of study, although the corporate purposes recite the power to do so. In addition, the board is entitled to consider that little academic credit is given to the work of participants. However, these negative circumstances do not dispose of the underlying question

whether CSA's activities are predominantly educational. See *Worcester* v. *New England Inst. & New England School of Accounting, Inc.,* 335 Mass. 486, 495 (1957). The participants are generally college graduates, many with postgraduate degrees. A certificate from CSA and academic recognition of participation in CSA's programs are not likely to be important to such people.

The board may have been influenced by other factors which we think may not be significant in evaluating the operation of CSA. (a) The board commented on the limited personal property "endowment" of CSA. Endowment itself is not essential to establish an entity's status as charitable (*Assessors of Boston* v. *Garland School of Home Making, supra* at 390-391), and, as to personal property, it is unclear what items were lacking at CSA which should have been there to show its educational character. (b) The fact that no instructional salaries were paid, and thus instructional expenses were small, does not help answer the basic question, where CSA claims that the participants learned from each other. (c) The fact that amounts paid by participants did not cover the cost of operating CSA's summer programs tends to support, not weaken, CSA's position. The usual argument is that the lack of scholarship aid belies the charitable nature of an entity. See *Assessors of Boston* v. *Garland School of Home Making,* 296 Mass. 378, 389-390 (1937). It appears that numerous nonparticipants have made contributions to offset CSA's operating deficits. This may have some bearing on whether CSA is being operated for a public charitable purpose. (d) The presence of a few spouses (all of whom CSA claims qualified as participants) and children of certain participants may be weighed in considering the nature of CSA's activities, although that circumstance may not be of much, or any, significance in particular circumstances. *Assessors of New Braintree* v. *Pioneer Valley Academy, Inc.,* 355 Mass. 610, 613-616 (1969). *Trustees of Phillips Academy* v. *Andover,* 175 Mass. 118, 124 (1900). (e) There is no evidence to indicate that CSA's rule against attendance for more than three summers was developed in response to a threat of tax liability, but, even if such a change of policy

was adopted to strengthen CSA's claim of tax exemption, tax avoidance by careful planning is of neutral significance and does not alter the need to evaluate CSA's actual operations. (f) The fact that participants spent part of their time in recreational activities would not undermine a use which is otherwise educational. *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph,* 334 Mass. 530, 541 (1956). *Trustees of Amherst College* v. *Assessors of Amherst,* 193 Mass. 168, 172-173 (1906). *Emerson* v. *Trustees of Milton Academy,* 185 Mass. 414, 416 (1904). (g) The board referred to the fact that CSA owned 150 acres of land. Our cases have indicated that the judgment of the management of a charitable institution concerning what facilities are required for its purposes will be respected unless the evidence shows that that judgment is unreasonable or not made in good faith. *Assessors of New Braintree* v. *Pioneer Valley Academy, Inc., supra* at 614. *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph, supra* at 540-541. *Trustees of Amherst College* v. *Assessors of Amherst, supra* at 172-173. Of course, even if some of the land owned by CSA was not reasonably needed for its purposes, the entire property would not thereby become taxable.

The board must reconsider the evidence to determine if CSA's operation is predominantly educational. The burden of proof is on CSA to establish clearly and unequivocally its right to an exemption (*Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 257 [1936]), and we decline CSA's invitation to take the rare step of ruling on this record, as matter of law, that it is entitled to an exemption. See *Fisher School* v. *Assessors of Boston,* 325 Mass. 529, 534 (1950). The credibility of witnesses, the weight of the evidence, and inferences to be drawn from the evidence are matters for the board.[7] *Ibid.*

---

[7] The board stated that "[t]he credibility of the appellant's witnesses did not particularly impress us." The only respect in which the board sought to document this conclusion by references to testimony appears, from the written words of the transcript, to be unfairly critical of the witness.

In determining whether CSA's dominant activity is educational, the opinions of expert educators may be significant. Some of CSA's witnesses were qualified educators and testified that CSA's operations were educational. Although CSA does not press the point here, the member of the board who heard the case, to some degree, foreclosed CSA's efforts to show that the processes in which it engages are beneficial to persons who are already educators and that comparable activities are carried on elsewhere for students in established educational institutions. The board, in its discretion, may wish to hear further evidence concerning whether nontraditional, unstructured activities of the character carried on by CSA are nevertheless educational.

The decision of the Appellate Tax Board is reversed and proceedings are remanded to the board for further consideration in light of this opinion.

*So ordered.*